2011 UT 5

STATE of Utah, Plaintiff and Appellee,

v.

Fred MUNGUIA, Defendant
and Appellant.

No. 20090215.

Supreme Court of Utah.

Jan. 14, 2011.

Mark L. Shurtleff, Att'y Gen., Ryan D. Tenney, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Elizabeth Hunt, Salt Lake City, for defendant.

DURRANT, Associate Chief Justice:

## INTRODUCTION

¶ 1 Fred Munguia challenges two consecutive sentences of three years to life and two consecutive sentences of one to fifteen years that he received after pleading guilty to two counts of attempted aggravated sexual abuse and two counts of sexual abuse of his daughter. Mr. Munguia's challenges were not preserved at sentencing and are raised on appeal under the exceptional circumstances, plain error, and ineffective assistance of counsel doctrines. Mr. Munguia contends that the district court judge should have recused himself prior to sentencing. Mr. Munguia also contends that he should be resentenced by a court guided by the relevant statutes, which he argues were not presented to the district court at sentencing. We reject Mr. Munguia's contentions and affirm his sentence. We hold that the district court judge was not required to recuse himself and that Mr. Munguia's sentence complies with Utah law.

## BACKGROUND

¶ 2 Fred Munguia was charged with three counts of aggravated sexual abuse of a child and one count of sodomy upon a child for offenses he allegedly committed against his daughter between December 2000 and July 2007. Mr. Munguia later pleaded guilty to two counts of attempted aggravated sexual abuse of a child and two counts of sexual abuse of a child before Third District Court Judge Michele Christiansen. The victim and Mr. Munguia described the duration of the abuse underlying these convictions differently. The victim said the abuse started when she was seven or eight years old and lasted until she was thirteen. Mr. Munguia claimed it happened when she was fourteen over a three-to-four-month period (although the victim was thirteen at the time, she went to police in July 2007, about a week after the last time either she or Mr. Munguia says the abuse occurred).

¶ 3 Pursuant to statute and to aid the court in sentencing Mr. Munguia, Adult Probation

and Parole ("AP & P") prepared a presentence report ("PSR"). The PSR contained a separate psychosexual evaluation, which, contrary to AP & P's ultimate conclusions in the PSR, did not recommend consecutive sentencing. The evaluation gave credit to Mr. Munguia for admitting to the offense and for his motivation to participate in therapy. But it also acknowledged that Mr. Munguia had "a significant deviant interest in child molestation behaviors which he is not willing/able to acknowledge at this time." It described Mr. Munguia as "very emotionally needy," and stated that he

> is *not taking any responsibility or accountability* for his actions. Instead, he is utilizing a great deal of *rationalization and justification* to explain away his responsibility. In fact, he appears to believe that the incidents occurred as he was trying to teach the victim about sexual matters, that at least some of [her] allegations were untrue, and that the incidents occurred because his life was stressful.[1]

Mr. Munguia's own statement of the offense, as contained in the PSR, was inconsistent, and he evaded the issue when asked to describe what actually occurred. At first, he indicated that his daughter had offered to help him masturbate, although he later stated that "[i]t started when I was masturbating. I asked her if she wanted to help and she did. I thought it was okay and that it would be a good learning experience for her. She is my daughter." He also seemed unwilling to acknowledge the full range of criminal sexual behavior his daughter alleged: "I fondled her, she helped me masturbate ... she performed oral sex ... but I didn't rape her. I never had intercourse with her. They said I might have just barely penetrated her with my finger maybe." The evaluator ultimately recommended Mr. Munguia as a candidate for "continued community correctional supervision (i.e., probation)," but acknowledged that "the ultimate legal decisions and consequences that the patient faces are respectfully reserved for the Court and/or Adult Probation and Parole."

¶ 4 Ultimately, AP & P did not adopt the psychosexual evaluator's probation recommendation, and instead recommended consecutive prison sentences to the court. AP & P reasoned as follows:

> [AP & P] agrees with the psychosexual evaluation, and feels many current inconclusive areas regarding the defendant's sexual deviancy issues, need to be addressed through a long-term treatment intervention. Incarceration is a vital part of this process, to teach the defendant this type of behavior demands retribution be paid to the community, for behavior which is inexcusable. It would seem Mr. Munguia does not recognize the extent of grooming, special position of trust, or divisive means he used, to manipulate the innocence of his daughter for the multiple years he did. *Considering the numerous aggravating factors in this matter, it seems anything less than a prison recommendation would be a significant disservice to the community, and its safety.*[2]

The PSR made no mention of the statutes or the factors under the statutes that would control whether or not Mr. Munguia would have been eligible for probation or concurrent, rather than consecutive, sentences.

¶ 5 Judge Christiansen, the judge who accepted Mr. Munguia's guilty pleas, did not sentence Mr. Munguia. Instead, the sentencing judge was Judge Kouris, also of the Third District Court. Mr. Munguia's attorney acknowledged that she had read the PSR with Mr. Munguia and that there were no factual changes to be made. Mr. Munguia's attorney requested a one-year jail sentence followed by sex-offender treatment, reasoning that Mr. Munguia had a stable work history (although he was unemployed at the time) and that he had been attending sex-offender treatment once a week for a year.

¶ 6 The prosecutor recommended consecutive sentencing. In support of this recommendation, the prosecutor described the challenges the victim was then facing and the challenges she would continue to face, including losing a father for the rest of her life and not having someone to walk her down the

---

1. (Emphases added.)

2. (Emphasis added.)

aisle. The prosecutor noted that the victim had completed therapy for these issues, that she continued to blame herself, and that she would struggle for some time. The prosecutor pointed to statements by Mr. Munguia in the PSR that indicated that he was still trying to minimize what happened and cast blame on the victim—including the statements that, as her father, he felt this could be a "good learning experience for her," and that the abuse had occurred over a three-to-four-month period instead of over the years-long period the victim claimed. She noted that the victim had stated that the abuse actually began when she was seven or eight, beginning with fondling, but escalating to fellatio, digital penetration, and rubbing his penis on her vagina. The prosecutor described a technique Mr. Munguia used to groom his daughter, telling his daughter that doctors had told him masturbation was medically necessary, and that he needed assistance. She concluded, "[T]he State believes that this is a crime where prison is not even questionable. It would be a great injustice to the victim and to society if prison was not imposed on this Defendant." To support her recommendation of consecutive sentencing, the prosecutor looked at "several things":

> We looked at the *egregious conduct* with the victim. There is only one victim, but it went on for a *significant amount of* time. It *escalated in seriousness* from touching up to rubbing his penis on her vagina. There [were] *numerous violations.* And he did spare her from having to testify, but we're concerned with justice for the victim and justice for our community. And I think given his *minimization*—and [that] he is still *not willing to acknowledge* or take the complete blame for this is apparent through the statements he's made in the presentence report and the psychosexual evaluation.[3]

¶ 7 Mr. Munguia's attorney responded by quoting statements made by Mr. Munguia in the PSR that she said indicated that Mr. Munguia had accepted responsibility: "I believe that the reason for my involvement was being lonely. And I feel awful about what happened. I also feel terrible about the crime. Yes, it was wrong. Yes, I feel extreme sympathy for my daughter." Mr. Munguia then apologized to the court, and after prompting by his attorney, to his daughter, who was not present.

¶ 8 The court then spoke to Mr. Munguia:

Court: It sounds like she may have brought a little bit of this onto herself, don't you think, when she walked into the bathroom that day?

Defendant: I don't know, Your Honor.

Court: Well, I know. Actually, she didn't have anything to do with this. She's a little kid.

Defendant: I know.

Court: Sounds to me like we still don't know whose fault this is, do we?

Defendant: It's my fault, Your Honor.

Court: Oh, it is your fault?

Defendant: Yes, sir.

Court: You still think that this was a good thing for her? You think it is a good thing—good experience for her to masturbate you and perform oral sex on you?

Defendant: No, sir.

Court: Is that still a good thing for her?

Defendant: No, sir.

Court: What we have here is an innocent child who you ruined. Do you understand that?

Defendant: Yes, sir, I do.

Court: I don't think you do. Do you understand that the odds of this child having a stable marriage are almost zero? Do you understand that?

Defendant: Yes, sir.

Court: For your own selfish filthy needs is that what this is about?

Defendant: Yes.

Court: How long did this take place? I know you told the presentence report writer a few months. How long did it really take place?

Defendant: That was it, Your Honor.

Court: A few months?

Defendant: Yes.

---

3. (Emphases added.)

. . . .

Court: That is what you are going to stick with today then? It took place a couple months?

Defendant: Yes, three or four months.

Court: There are very, very few cases ever that are worse than what you have done. Ever. In my opinion this is up there with a homicide case. You have destroyed this little girl and you are her father. To groom her and make her think all of this stuff is okay because it's her dad and she is doing it because she trusts you.

I can honestly tell you there is almost never a [situation] where I want to put a person in prison and more times than not I do everything I can not to. And this is one of those few cases where I wish there was more I could do to you. On each one of the first degree felonies I'm going to sentence you to three to life in the Utah State Penitentiary that will run consecutive with each other. On the second degree felonies they will as well run—1 to 15 and they will run consecutively to each other, as well. That should come out to be a 8 to 30 year prison sentence.

Plus, when we're done here today I'm going to sit down and write a personal letter to the Board of Pardons to say that if you step out of prison one day short of 30 years it's an injustice to this community. If you are out one day before your—what is that? Thirty years. 83rd birthday, sir, I guarantee this entire community is still going to be at risk.

¶ 9 Mr. Munguia now appeals his consecutive sentences arguing that Judge Kouris's comments at sentencing indicate a judicial bias that violated his due process rights. Mr. Munguia also argues that his sentencing ran afoul of the Utah statute governing probation for sex offenders. We have jurisdiction pursuant to section 78A–3–102(i) of the Utah Code.

## STANDARDS OF REVIEW

¶ 10 Because these issues were not preserved below, Mr. Munguia argues that we should reach the issues under one of three doctrines: exceptional circumstances, plain error, or ineffective assistance of counsel.

¶ 11 The exceptional circumstances doctrine allows this court to reach an unpreserved issue in cases involving "rare procedural anomalies."[4] "We . . . appl[y] the exception sparingly, reserving it for the most unusual circumstances where our failure to consider an issue that was not properly preserved for appeal would . . . result[ ] in manifest injustice."[5]

¶ 12 The plain error standard of review is also intended to avoid manifest injustice.[6]

To demonstrate plain error, a defendant must establish that [1] an error exists; [2] the error should have been obvious to the trial court; and [3] the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, our confidence in the verdict is undermined.[7]

¶ 13 Finally, "[t]o prove ineffective assistance of counsel, [a] defendant must show: (1) that counsel's performance was objectively deficient, and (2) a reasonable probability exists that but for the deficient conduct defendant would have obtained a more favorable outcome at trial."[8] The "prejudice analysis is the same under both a plain error and ineffective assistance of counsel framework."[9]

---

4. *State v. Nelson–Waggoner*, 2004 UT 29, ¶ 23, 94 P.3d 186 (internal quotation marks omitted).

5. *Id.*

6. *State v. Holgate*, 2000 UT 74, ¶ 13, 10 P.3d 346.

7. *Id.* (internal quotation marks omitted).

8. *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162.

9. *State v. Ott*, 2010 UT 1, ¶ 42 n. 4, 247 P.3d 344, petition for cert. filed, 79 U.S.L.W. 3254 (U.S. Oct. 12, 2010) (No. 10–490).

## ANALYSIS

¶ 14 We address each of the issues Mr. Munguia raises on appeal in turn. First, we hold that Judge Kouris was not required to recuse himself. Second, we hold that Judge Kouris's sentencing decision was in compliance with Utah law and affirm Mr. Munguia's sentences.

## I. UNDER ANY STANDARD OF REVIEW, JUDGE KOURIS WAS NOT REQUIRED TO RECUSE HIMSELF BECAUSE NOTHING IN THE RECORD SUGGESTS THAT HE WAS NOT IMPARTIAL

¶ 15 Because there is nothing in the record to suggest that Judge Kouris was not impartial, Judge Kouris was not required to recuse himself and Mr. Munguia's due process rights were not violated. Mr. Munguia begins by citing the state and federal constitutions[10] as sources for a criminal defendant's right to an impartial judge. He ultimately reasons that Judge Kouris's remarks at sentencing indicated a feeling of ill will or hostility toward Mr. Munguia that would lead a reasonable person to question his impartiality. Indeed, a criminal defendant has a constitutional right to an impartial judge under the Due Process Clause of the Fourteenth Amendment.[11] And the presence of a judge who is not impartial constitutes a structural defect in the trial mechanism that violates the United States Constitution and requires reversal.[12]

¶ 16 But Mr. Munguia does not further develop what kind of judicial conduct might constitute a violation of his due process rights and instead discusses when recusal is appropriate under the Utah Code of Judicial Conduct and Rules of Professional Conduct. Such an approach incorrectly equates judicial conduct that would violate a criminal defendant's constitutional rights with judicial conduct that might lead to sanctions for a judge. In drafting our own rules of judicial conduct, we imposed higher standards on judges than the Constitution requires to protect the rights of defendants.[13] So even if Mr. Munguia were to show that Judge Kouris engaged in conduct worthy of sanctions under the Code of Judicial Conduct, he would still need to show that the conduct violated his constitutional rights in such a way that merits reversal of his sentence.

¶ 17 But even under our higher standards of judicial conduct, Mr. Munguia's charges of bias fail. Utah's Code of Judicial Conduct addresses when a judge ought to recuse himself due to personal bias. Canon 3 of this code provides a nonexhaustive list of instances where a judge's impartiality "might rea-

10. Mr. Munguia alleges that Judge Kouris's remarks at sentencing violated his rights under the due process clauses of both the Utah and United States Constitutions. But Mr. Munguia "does not argue that the Utah Constitution affords him greater protection than the United States Constitution, nor does he provide any analysis of how the two constitutional provisions differ, so we address the issue only under the United States Constitution." *See State v. Harker*, 2010 UT 56, ¶ 10 n. 8, 240 P.3d 780. Further, we do not address Mr. Munguia's argument under the Utah Constitution because Mr. Munguia provides only one "bald citation" to the Utah Constitution without further developing that authority, and thus his argument is inadequately briefed. *See State v. Timmerman*, 2009 UT 58, ¶ 25 n. 5, 218 P.3d 590.

11. *Tumey v. Ohio*, 273 U.S. 510, 535, 47 S.Ct. 437, 71 L.Ed. 749 (1927) ("No matter what the evidence was against him, he had the right to have an impartial judge.").

12. *Arizona v. Fulminante*, 499 U.S. 279, 308–10 & n. 8, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

13. In *Caperton v. A.T. Massey Coal Co.*, the United States Supreme Court stated that " 'most matters relating to judicial disqualification do not rise to a constitutional level.' " —— U.S. ——, 129 S.Ct. 2252, 2259, 173 L.Ed.2d 1208 (2009) (quoting *FTC v. Cement Institute*, 333 U.S. 683, 702, 68 S.Ct. 793, 92 L.Ed. 1010 (1948)). As an example of the kind of matter that would "not rise to a constitutional level," the Court specified that "[p]ersonal bias or prejudice 'alone would not be sufficient basis for imposing a constitutional requirement under the Due Process Clause.' " *Id.* at 2258 (quoting *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 820, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986)). Instead, regulation of personal bias is generally "left to statutes and judicial codes." *Id.* at 2259. Our Code of Judicial Conduct regulates personal bias strictly, requiring recusal where "the judge has a personal bias or prejudice" that might cause the judge's impartiality to "reasonably be questioned." Utah Code of Judicial Conduct Canon 3E.(1).

sonably be questioned," requiring recusal of the judge.[14] It indicates that one of these instances is where "the judge has a strong personal bias or prejudice concerning a party or a party's lawyer, a strong personal bias involving an issue in a case, or a personal knowledge of disputed evidentiary facts concerning the proceeding." [15] In *In re Inquiry Concerning a Judge*, we defined the concepts of personal bias and prejudice as contained in Canon 3E.(1)(a):

> Bias and prejudice are only improper when they are personal. A feeling of ill will or, conversely, favoritism toward one of the parties to a suit are what constitute disqualifying bias or prejudice. For example, where a judge stated that he "could not stand" a certain law enforcement officer and would not accept cases initiated by him, it was found that his personal feelings and intense dislike of the officer were improper. However, neither bias nor prejudice refers to the attitude that a judge may hold about *the subject matter* of a lawsuit. The Canon contemplates disqualification where, for instance, a judge has prior knowledge of evidentiary facts, is related to a party or an attorney, has a close social or professional relationship with a party or an attorney, was involved in the case at hand before becoming a judge, or has a financial or property interest that could be affected by the outcome of the proceeding. In other words, *the bias or prejudice must usually stem from an extrajudicial source, not from occurrences in the proceedings before the judge.*[16]

¶ 18 Mr. Munguia contends that the trial court's comments at the sentencing hearing violate Canon 3 of the Judicial Code of Conduct and his due process rights because they "would not only lead a person to reasonably question the trial court's impartiality, but also establish hostility and ill will toward Munguia by the trial court." He suggests that the following comments made by the judge during the sentencing hearing display the kind of bias forbidden by the Judicial

Code of Conduct and the Utah Rules of Professional Conduct governing civility: (1) challenging Mr. Munguia about whether he understood who was at fault for the abuse; (2) twice asking Mr. Munguia if he still thought it was a good experience for his daughter to masturbate and fellate him; (3) commenting that Mr. Munguia had "ruined" an innocent child; (4) stating that Mr. Munguia's daughter now had "almost zero chance of having a stable marriage"; and (5) "opining" that Mr. Munguia had "destroyed" his daughter, who trusted him.

¶ 19 But none of these comments show that Judge Kouris's ill will toward Mr. Munguia was influenced by an extrajudicial source, and there is more than enough information in the record to indicate that any bias against Mr. Munguia stemmed from "occurrences in the proceedings before the judge." [17] For instance, Judge Kouris's outrage at Mr. Munguia's equivocation about who was at fault and whether the abuse was a good idea were most likely based on Mr. Munguia's own statements in the PSR. Similarly, Judge Kouris's comments about the effects the abuse had on Mr. Munguia's daughter were also likely based on statements in the PSR ("The victim in this matter has been attending counseling for over a year, having suffered an extensive level of emotional anxiety and trauma.") and statements made by the prosecutor at sentencing ("Clearly the victim's innocence has been robbed."). Mr. Munguia does not attempt to show that Judge Kouris's anger was motivated by an extrajudicial source or anything other than Mr. Munguia's own actions in this case, and thus he has not shown the kind of bias Utah's Code of Judicial Conduct contemplates to require recusal. Because Judge Kouris was not required to recuse himself, Mr. Munguia's counsel was also not ineffective when she did not request recusal.

¶ 20 Certainly, we expect our judges to "be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with

---

14. Utah Code of Judicial Conduct Canon 3E.(1).

15. *Id.* Canon 3E.(1)(a).

16. 1999 UT 81, ¶ 35, 984 P.2d 997 (emphases added) (citations omitted) (internal quotation marks omitted).

17. *Id.*

whom the judge deals in an official capacity."[18] But that does not mean that due process or our Code of Judicial Conduct are violated whenever a defendant's criminal conduct and subsequent excuses inspire anger in a judge. Perhaps there is a judge who could remain emotionally neutral when faced with a father who sexually abused his daughter, tended to blame her for the abuse, and then tried to rationalize it by stating that he thought it would have been a good experience for her. But no law requires it. Thus, Mr. Munguia's due process rights were not violated by Judge Kouris, and he did not need to recuse himself.

## II. JUDGE KOURIS'S SENTENCING OF MR. MUNGUIA DID NOT CONSTITUTE PLAIN ERROR, NOR DID IT GIVE RISE TO AN EXCEPTIONAL CIRCUMSTANCE, NOR DID MR. MUNGUIA RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING

¶ 21 It was neither plain error nor did it give rise to an exceptional circumstance when Judge Kouris sentenced Mr. Munguia to consecutive sentences and not to probation.[19] Additionally, Mr. Munguia's attorney did not provide ineffective assistance when she did not inform the court of the statutes governing probation decisions or discuss the possibility that Mr. Munguia might have met the statutory criteria for probation. This part of the opinion will address separately (A) why Judge Kouris's sentencing decision was not plain error and did not give rise to an exceptional circumstance, and (B) why Mr. Munguia did not receive ineffective assistance of counsel.

### A. It Was Not Plain Error for Judge Kouris Not to Sentence Mr. Munguia to Probation, Nor Did it Give Rise to an Exceptional Circumstance

¶ 22 Because the pertinent sentencing statute gives the district court discretion not to sentence Mr. Munguia to probation, the district court did not commit any error, let alone plain error, when it exercised that discretion to sentence Mr. Munguia to consecutive prison terms. Further, it did not give rise to the kind of exceptional circumstance that excuses nonpreservation when the court did not sentence Mr. Munguia to probation, because such a sentence is not a procedural anomaly, nor is it manifestly unjust. Under plain error review, Mr. Munguia "must establish that [1] an error exists; [2] the error should have been obvious to the trial court; and [3] the error is harmful."[20] And we reserve exceptional circumstances review for cases involving "rare procedural anomalies ... where our failure to consider an issue that was not properly preserved for appeal would ... result[ ] in manifest injustice."[21] Mr. Munguia does not satisfy his burden on appeal under either standard, and his sentence did not result in manifest injustice.

¶ 23 The Utah Code allows those convicted of sex offenses against children to receive probation for their offense under a very narrow set of circumstances enumerated by statute.[22] This statute (the "probation statute" or the "statute") requires defendants to show that certain circumstances are present before the court can even consider probation.[23] The statute normally requires that the defendant prove the existence of all of these circumstances by a preponderance of the evidence, but for the particular offenses to which Mr. Munguia pleaded guilty, this requirement is

18. Utah Code of Judicial Conduct Canon 3B.(4).

19. Mr. Munguia also mentions the statute governing concurrent/consecutive sentencing decisions, Utah Code Ann. § 76–3–401(2) (2008), as something the judge should have considered when sentencing Mr. Munguia, but concedes that it is not necessary for the sentencing court to enter findings under the statute, and does not further develop an argument as to how Mr. Munguia's sentence does not accord with this statute. Because no argument is adequately briefed regarding how this statute should influ-

ence our decision, we decline to reach the issue. See supra note 8.

20. State v. Holgate, 2000 UT 74, ¶ 13, 10 P.3d 346 (internal quotation marks omitted).

21. State v. Nelson–Waggoner, 2004 UT 29, ¶ 23, 94 P.3d 186 (internal quotation marks omitted).

22. See Utah Code Ann. § 76–5–406.5.

23. Id. § 76–5–406.5(1).

slightly relaxed. Instead of requiring proof by a preponderance of the evidence of all circumstances,[24] "the court shall consider the circumstances ... as advisory in determining whether or not execution of sentence should be suspended and probation granted. The defendant is not required to satisfy all of those circumstances for eligibility...."[25] But even if the defendant is eligible for probation under the statute, probation remains discretionary with the court, "considering the circumstances of the offense, including the nature, frequency, and duration of the conduct, and considering the best interests of the public and the child victim."[26]

¶ 24 The court in this case committed no error, much less plain error,[27] as it is clear that the probation statute gives the sentencing court full discretion not to suspend a sentence even if a defendant is eligible for probation under the statute.[28] "[A] 'defendant has no right to be placed on probation....'"[29] Rather, once a defendant has entered a guilty plea, the defendant is only entitled to receive the sentence the law provides. "'[P]robation [remains] within the discretion of the trial judge.'"[30]

¶ 25 The only statutory restrictions that were placed on Judge Kouris's discretion here were that he consider "the circumstances of the offense, including the nature, frequency, and duration of the conduct, and ... the best interests of the public and the child victim."[31] In his statement at sentencing, Judge Kouris made remarks that indicated he had considered the circumstances of the offense, the best interests of the public, and the best interests of the child victim. Because Judge Kouris exercised his discretion in a manner consistent with the probation statute, Mr. Munguia's sentence was not plain error.

¶ 26 Further, Mr. Munguia's sentence did not give rise to an exceptional circumstance. Because a convicted defendant has no vested right in probation, but only to have "the sentence provided by law imposed on him," Mr. Munguia's sentence is not a procedural anomaly nor is it manifestly unjust; it is the sentence provided by law for the crimes to which he pleaded guilty.

¶ 27 Mr. Munguia also argues that the PSR and psychosexual evaluation should have "been guided by the probation statute." Mr. Munguia cites *State v. Hammond* for the proposition that we should "reverse and remand so that the presentence report and Psychological Evaluation may be redone or revised to reflect the applicable statutes and standards."[32] But the facts in this case are distinguishable from those in *Hammond*. In *Hammond*, the PSR recommended probation without mentioning the statutory requirements that needed to be met for that recommendation to be legal.[33] The district court in *Hammond* refused to sentence the defendant to probation because it mistakenly assumed that using force was an element of the charge to which the defendant had pleaded guilty, which would have made the defendant ineligible under the statute to receive probation.[34] We remanded because the judge had possibly misunderstood the law, the PSR contained "a mistaken assumption about sentencing options," and the judge had made an assumption about the use of force not justified by the record.[35]

---

24. *See id.* § 76–5–406.5(5).

25. *Id.* § 76–5–406.5(8).

26. *Id.* § 76–5–406.5(1).

27. *See Holgate*, 2000 UT 74, ¶ 13, 10 P.3d 346 ("To demonstrate plain error, a defendant must establish that ... an error exists ...." (internal quotation marks omitted)).

28. Utah Code Ann. § 76–5–406.5(1).

29. *State v. Pritchett*, 2003 UT 24, ¶ 36, 69 P.3d 1278 (quoting *State v. Smith*, 842 P.2d 908, 910 (Utah 1992)).

30. *Id.* (quoting *Smith*, 842 P.2d at 910).

31. Utah Code Ann. § 76–5–406.5(1).

32. 2001 UT 92, ¶ 25, 34 P.3d 773.

33. *See id.* ¶¶ 10, 22–23.

34. *Id.* ¶¶ 9–11, 25.

35. *Id.* ¶ 25.

¶ 28 By contrast, in this case Judge Kouris made no determination about Mr. Munguia's eligibility for probation because Judge Kouris exercised his discretion *not* to sentence Mr. Munguia to probation. Unlike in *Hammond*, the PSR did not recommend probation, so the PSR did not need to justify the reasoning for its recommendation in the probation statute. Here, AP & P recommended consecutive sentences in the PSR and grounded its reasoning in the "numerous aggravating factors" surrounding the offense and concern for the community's safety. The plain language of the probation statute indicates these factors are sufficient to guide a judge in his discretion.[36]

¶ 29 Because Judge Kouris appropriately exercised his discretion to sentence Mr. Munguia to consecutive sentences, Mr. Munguia's sentence is not plain error, nor did it give rise to an exceptional circumstance requiring reversal.

### B. Mr. Munguia Did Not Receive Ineffective Assistance of Counsel at the Sentencing Hearing

■■■ ¶ 30 Even if it is assumed that Mr. Munguia's attorney performed deficiently, because we conclude there is no reasonable probability that Mr. Munguia would have received a more favorable outcome had his trial attorney pursued the strategy he now suggests on appeal, we hold Mr. Munguia did not receive ineffective assistance of counsel. "To prove ineffective assistance of counsel, [Mr. Munguia] must show: (1) that counsel's performance was objectively deficient, and (2) a reasonable probability exists that but for the deficient conduct [Mr. Munguia] would have obtained a more favorable outcome at trial." [37] When reviewing ineffec-

tive assistance of counsel claims, we strongly presume that trial counsel provided adequate assistance and that any action complained of was sound trial strategy.[38] "To show prejudice in the ineffective assistance of counsel context, the defendant bears the burden of proving that counsel's errors actually had an adverse effect on the defense and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." [39] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." [40] "Additionally, proof of ineffective assistance of counsel cannot be a speculative matter but must be a demonstrable reality." [41] In the sentencing context, this court considers the totality of the evidence before the judge and determines if there is a reasonable probability the judge would have reached a different outcome absent the attorney's deficient performance.[42]

■■■ ¶ 31 Even assuming that it was error for Mr. Munguia's counsel not to present evidence on the factors determining eligibility for probation—a finding we do not make— Mr. Munguia cannot demonstrate that such evidence would have persuaded the court not to impose consecutive sentences. Mr. Munguia argues that his counsel should have provided expert opinion on the extent of the harm his sexual abuse caused his daughter and on whether a probation sentence for Mr. Munguia would have served her interests. Mr. Munguia also argues that counsel should have sought a psychosexual evaluation to address the criteria in the probation statute (although the psychosexual evaluation in the PSR already recommended probation). Had counsel focused on the statutory probation

---

**36.** *See* Utah Code Ann. § 76–5–406.5(1) (listing the safety of the community and the circumstances surrounding the offense as considerations for the judge in deciding whether or not to grant probation).

**37.** *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162.

**38.** *State v. Ott*, 2010 UT 1, ¶¶ 22, 34, 247 P.3d 344, *petition for cert. filed*, 79 U.S.L.W. 3254 (U.S. Oct. 12, 2010) (No. 10–490).

**39.** *Id.* ¶ 40 (internal quotation marks omitted).

**40.** *Taylor v. State*, 2007 UT 12, ¶ 56, 156 P.3d 739 (internal quotation marks omitted).

**41.** *Nicholls v. State*, 2009 UT 12, ¶ 36, 203 P.3d 976 (internal quotation marks omitted).

**42.** *See Taylor*, 2007 UT 12, ¶ 56, 156 P.3d 739. We proceeded in that case to analyze the evidence the jury would have heard had Mr. Taylor's attorney pursued his proffered strategy. *Id.* ¶¶ 58–60. Although we do not find that Mr. Munguia's counsel's performance was deficient, we now engage in a similar analysis.

factors—as Mr. Munguia asserts she should have—the most favorable evidence the district court could have had before it would have shown only that Mr. Munguia did not use force, that he did not cause bodily injury to his daughter, that there was not more than one victim, that Mr. Munguia did not use pornography in his offense, that he acted alone, that he did not encourage his daughter to engage in prostitution, that he admitted to his offenses in his guilty plea, that he could have been rehabilitated in treatment, that he was not an exclusive pedophile and did not present a danger to the community, and that it was in his daughter's best interest that he be sentenced to probation.

¶ 32 But the sentencing court already had virtually all of this evidence before it in the PSR and psychosexual evaluation. For instance, it was never asserted that Mr. Munguia used force or caused bodily injury to his daughter, that he abused additional victims or used pornography in his offense, that he encouraged his daughter to engage in prostitution, or that he acted with accomplices. The psychosexual evaluation indicated he was *not* an exclusive pedophile and that he was motivated to participate in therapy and treatment. The psychosexual evaluation even ultimately recommended probation, which Mr. Munguia's attorney pointed out at sentencing. Additionally, Mr. Munguia's attorney noted that he had no prior criminal history, had worked a steady job for fourteen years, and that he had been attending sex-offender treatment for a year.

¶ 33 The only information that could have been obtained by a focus on the probation-eligibility factors that the court did not already have before it is an assessment from an expert of Mr. Munguia's daughter's needs and an additional psychosexual evaluation that, at best, might have come to much the same conclusion that the first one did and similarly recommend probation. But this assumes that either of these evaluations would have yielded results favorable to Mr. Mung-

uia. Experts might just as easily have said that it was in Mr. Munguia's daughter's best interest that he be sentenced to prison, and might have concluded, as the PSR did, that incarceration was vital to Mr. Munguia's rehabilitation. Any benefit Mr. Munguia might have gained from a shift in focus to the probation factors is purely speculative, and such a focus might just as easily have yielded unfavorable results for Mr. Munguia.

¶ 34 Regardless of how his attorney might have argued, the State would have likely responded with its own characterization of the factors, which might have included Mr. Munguia's reluctance to admit (admission being one of the probation-eligibility factors) [43] that he had digitally penetrated his daughter. One of the probation statute's factors is that the court must agree with the psychosexual evaluation's assessment that Mr. Munguia was not a danger to the community.[44] Judge Kouris clearly did not agree with this assessment. The State could have further focused on Mr. Munguia's dangerousness to the community and to his daughter. The State may also have placed heavier emphasis on the "nature, frequency, and duration of the conduct," [45] which by Mr. Munguia's own admission, happened at least two to three times per week for three to four months and included fondling, oral sex, and masturbation. Mr. Munguia further stated in the psychosexual evaluation, "They said I might have just barely penetrated her with my finger maybe."

¶ 35 Given the body of evidence the trial court likely would have heard had Mr. Munguia's counsel pursued the strategy he now suggests, it is highly improbable that the trial court would have issued a sentence more favorable to Mr. Munguia. Thus, no reasonable probability exists that Mr. Munguia was prejudiced by his attorney's actions below,[46] and he cannot establish his ineffective assistance of counsel claim.

43. Utah Code Ann. § 76–5–406.5(1)(h).

44. *Id.* § 76–5–406.5(1)(j)(ii).

45. *Id.* § 76–5–406.5(1).

46. Because Mr. Munguia cannot show he was prejudiced by his attorney's performance at sentencing, we do not reach whether his attorney's performance was deficient.

## CONCLUSION

¶ 36 Because Judge Kouris made no remark that indicated he was biased in any extrajudicial sense or that he was not impartial, Judge Kouris was not required to recuse himself. And because Judge Kouris appropriately exercised his discretion to sentence Mr. Munguia to consecutive prison sentences and not to probation, Mr. Munguia's sentence was not plain error nor did it give rise to an exceptional circumstance requiring reversal. Mr. Munguia did not receive ineffective assistance of counsel because even if his attorney had made the arguments and presented the evidence Mr. Munguia now contends she should have, it was not reasonably probable that Mr. Munguia would have received a more favorable result. Thus, we affirm the district court's sentence.

¶ 37 Chief Justice DURHAM, Justice PARRISH, Justice NEHRING, and Judge HARMOND concur in Associate Chief Justice DURRANT'S opinion.

¶ 38 Justice WILKINS does not participate herein; District Judge GEORGE M. HARMOND sat.